Mueller v Seed Invest Tech. LLC (2024 NY Slip Op 51121(U))

[*1]

Mueller v Seed Invest Tech. LLC

2024 NY Slip Op 51121(U)

Decided on August 29, 2024

Supreme Court, New York County

Borrok, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 29, 2024
Supreme Court, New York County

Joseph Mueller, Plaintiff,

against
Seed Invest Technology LLC, PLUTO HOLDINGS LLC, RYAN MICHAEL FEIT, CHRISTOPHER M MYERS, CIRCLE INTERNET FINANCIAL PUBLIC LIMITED COMPANY, SI SECURITIES LLC, Defendant.

Index No. 653225/2023

Plaintiffs by:
SQUITIERI & FEARON LLP, 305 Broadway Fl 7, New York, NY 10007
Defendants by:
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 919 Third Avenue, New York, NY 10022

Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 001) 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, 31, 39 were read on this motion to/for DISMISS.
Upon the foregoing documents, the defendants' motion to dismiss (Mtn. Seq. No. 001) is DENIED.
The Relevant Facts and Circumstances
This is a putative class action alleging violations of Section 12(a)(2) and 15 of the Securities Act of 1933 (the 1933 Act) brought on behalf of the plaintiff and a proposed class of investors who purchased NowRx's stock between February 1, 2022 through July 1, 2022 (the Proposed Class Period) pursuant to a barrage of some 48 hard sell email solicitations (the Email Solicitations; NYSCEF Doc. No. 30) sent during an approximately nine month period by [*2]Seed Invest Technology, LLC and/or SI Securities, LLC (collectively, Seed Invest) which told the plaintiff and other similarly situated potential class members, in effect, that they better "act now" because NowRx shares were flying off the shelf and they would lose the opportunity to invest in the then well positioned NowRx.
In the well-pled amended complaint (the AC; NYSCEF Doc. No. 9), the plaintiff alleges that he purchased NowRx Series C preferred stock on June 8, 2022 (approximately five months before NowRx's liquidation where the plaintiff lost his entire investment) pursuant to the Email Solicitations which gave the false and misleading impression that NowRx was doing great (i.e., instead of being in dire straits) and did not mention the "going concern" risks identified in the NowRx's prior September 29, 2021 Offering Circular (the Offering Circular; NYSCEF Doc. No. 15) or its May 2022 Form 1-K (the May 2022 1-K; NYSCEF Doc. No. 17) and instead and only in fine print in some of such Email Solicitations had a link to such dated documents. 
However, and significantly, according to the AC, even had an investor clicked on the link and reviewed those NowRx documents, the Email Solicitations still were materially misleading in violation of Section 12 because they gave the false impression that the going concern risks identified in the May 2022 1-K and the Offering Circular were being adequately addressed and also because they failed to disclose the significant costs and risks associated with an investment in NowRx at the time of the sales (including, by way of example, the cost of the Seed Invest capital raise itself). Indeed, if anything, according to the AC, the prior filings made the Email Solicitations all the more misleading because the Email Solicitations gave the plaintiff and other investors the impression that the once "down and out" NowRx was shoring up its financial capital needs and, as such, presented a great and limited opportunity for investment because the Email Solicitations emphasized the effectiveness of Seed Invest's capital raise campaign — i.e., the very concern identified in the "going concern" opinion in the Offering Circular and the May 2022 1-K.
To be clear, the plaintiff does not allege that the information provided in the Email Solicitations regarding topline revenue and share price growth, raw dollars invested, hiring of executives, etc., are affirmatively false. Rather, the claim is that the Email Solicitations painted a misleadingly optimistic picture of NowRx's viability as an investment by omitting adequate disclosures of NowRx's need for additional capital to stay afloat and the costs associated with Seed Invest's crowdfunding campaign which were not disclosed in the Offering Circular or the May 2022 1-K:
45. In or around May 2022, NowRx announced that it had again broken an [e]quity Crowdfunding record on SeedInvest with four days left in its solicitation of sales of NowRx equity campaign when it stated, "its current Series C equity crowdfunding round on SeedInvest, the leading equity crowdfunding platform, "surpassed $22.5M, making it the largest Regulation A investment in SeedInvest history."
46. In May 2022, SeedInvest forwarded prospective investors an email from Defendant Cary Breese, proclaiming, inter alia, "this a great investment" And touting the C stock offering fundraising. This email claiming was false and misleading because NowRx and/or SeedInvest knew or should have known at that time that the approximately 30% of Series C capital raise had been spent on advertising, in addition to the 8.5% commission to Seed and thus the amount of capital actually available to Seed from the offering was slightly more than 50% of what was represented to Plaintiff and investors.
47. On November 15, 2021, 2:04 p.m., SeedInvest sent Plaintiff and class members an email that included a message from CEO Cary Breese, who stated that with their "plans to expand to several new territories alongside potential new growth opportunities in specialty and mail order medication, we believe the future looks extremely bright in 2022."
48. On January 27, 2022, at 4:15 p.m., SeedInvest sent Plaintiff and class members an email that stated the company "reported two consecutive months or record-breaking revenue in November and December 2021, [that] explains NowRx's plans for nationwide expansion."
49. Similarly, on February 10, 2022, SeedInvest sent another email with a message from the newly acquired CFO, who stated "NowRx is growing quickly" and "[was] out in front of the competition."
50. On March 1, 2022, 4:09 p.m., SeedInvest sent an email quoting CEO Cary Breese, who stated, "the popularity of our newest telehealth service demonstrates NowRx's ability to expand beyond just prescription delivery" and "we believe this offers another incredible channel to scale revenue in the growing $61B_U.S. telehealth market."
51. Per an email on April 21, 2022, 1:56 p.m., SeedInvest stated "NowRx has continued to see strong traction in 2022, with four facilities announced, record-breaking revenue, and strategic hires . . . helping position the company for growth."
52. Despite this constant touting of company growth, record-breaking revenue, and expansion into a lucrative market, SeedInvest failed to disclose or warn that NowRx recent financial condition was materially worse than the stale financials in the Offering Circular showed.
53. On January 26, 2022, SeedInvest sent Plaintiff a "Deal Updates" email in which it touted NowRx in which it solicited Plaintiff to "Register here."
54. SeedInvest maintained a "profile" in its website for NowRx on which it posted NowRx updates thereto. SeedInvest's emails to Plaintiff included a link to click on the "profile."
55. On March 30, 2022 "SeedInvest" sent an email which stated, inter alia:
The successful campaign has surpassed 17.2 million raised making it the most funded live deal on SeedInvest.
56. SeedInvest sold NowRx Series C stock through its "SeedInvest platform" as it admitted in a May 8, 2022 email to Plaintiff, October 5, 2021 email.
57. In its March 1, 2022 email SeedInvest announced:
With over $15.9m raised from 5,000 investors don't Miss Your Chance to invest . . . .
58. In its May 19, 2022 email, SeedInvest implored Plaintiff:
As an existing investor in NowRx you might be following its historic Series C currently underway on SeedInvest making it the largest campaign in SeedInvest history.
And "Since the last count in 2020, the share price increased 203%."
The subject line stated: "You already hold an investment that's risen over 203%."
59. In its April 21, 2022 email to Plaintiff, SeedInvest announced that the "campaign has surpassed $18.5 million raised to date" and solicited Plaintiff and other investors to buy more C stock:
"There is still time to invest before the campaign closes on Friday, May 20, less than one month from today
. . .
Already invested and want to invest more? If you have already confirmed an investment in this current Series C round, you can increase your investment by investing again"
This was repeated in SeedInvest's May 10, 2022 email and April 27, 2022, May 1, 2022 and May 12, 2022.
60. In its May 1, 2022 email SeedInvest announced that NowRx had "surpassed $20m raised is successfully funded . . ." and that since its first raise on SeedInvest in 2015, NowRx has "grown its share price over 1650%."
61. It also stated:
The stock market may be up and down, but it has little correlation with private investments available on SeedInvest.
62. These solicitations failed to disclose that NowRx' percentage net proceeds of Series C, net of "Monthly Ad Spread" was steadily declining from 80% at the end of February 2022 to 69% by the end of May 2023.
63. In fact, despite touting the success of the SeedInvest offering, NowRx spent $867,500 on "Ad Spread" in March but raised only $1,438,250. In April the spread was $1,419,000 and the raise was $1,078,896; in May the spread was $2,839,000 and the raise was $3,390,000.
64. The Offering Statements available by links on SeedInvest emails would not have cured or ameliorated the misleading effects of SeedInvest emails because the linked Offering Statements were stale since they contained financial statement only as of June 30, 2021.
65. NowRx issued its "Offering Circular" dated September 29, 2021 and a supplement thereto dated January 21, 2022 (collectively "Offering Circular"). The Offering Circular was not sent to any investors in NowRx C stock but was sometimes accessible via a link in some of Seed's email blasts to its crowd funded investors.
66. The offering was for 'UP TO 7,002,801 SHARES OF PREFERRED STOCK" with a "minimum" of 238,095 shares.
67. In the "Use of Proceeds" statement at page 3, it stated:
Use Of Proceeds:
The net proceeds of the offering will be used to increase our research and development in pharmacy automation technology, accelerate our growth into new geographical regions and markets and expand operations to meet increasing consumer demand.
This statement was materially false and misleading because it led investors to believe that the "net" was only net of the 8.5% commissions when in a reality the true net proceed were about 30% lower due to "Ad Spreading" to generate sales of C stock.
68. In a more comprehensive "Use of Proceeds" section at pages 14-15 of the Offering Circular, it provided more detail about the use of proceeds and allocation of proceeds to things like "pharmacy operations and support," general administrative expenses of "employee compensation," "legal, and office expenses" and "sales and marketing." The Use of Proceeds in the September Offering Circular contained details on pages 14-15 about marketing expenses based upon various levels of the C stock offering size. For each offering scenario illustrated, the "sale and marketing" estimate was over 25% of the allocation of proceeds where the estimated offering size was between greater than $18.75 million up to the maximum net proceeds of $67.8 million. While the Offering Circular [*3]section Managements Discussion And Analysis" ("MDA") disclosed that "sales and marketing" expenses included marketing costs for the sales of Series A securities, it made no disclosure of any estimate of marketing expenses to solicit sales of the C stock through Seed. The estimates were stale and materially misleading by February 2022 because Seed knew, or should have known that the Ad Spreading to spur sales of C stock were increasing every month but were yielding diminishing results of C stock sold. A ordinary investor could not piece together from the Offering Circular that NowRx spent approximately $2,041,872 on marketing to solicit Series A stock sale while generating $18.75 million of net proceeds, a bit over 10% of the net proceeds in early stages (up to December 31, 2021) of the C stock offering which were ballooning upward through 2022.
69. In the "Liquidity and Capital Resources" section of the MDA (pages 31-32), NowRx informed investors: "As we have done historically, we may again in the future elect to finance operations by selling equity to finance operations by selling equity or debt securities or borrowing money" and went on to state: "If we are unable to raise additional capital or generate sufficient cash from operations to adequately fund our operations, we will need to curtail planned activities to reduce costs." Id. "Doing so will likely have an unfavorable effect on our ability to execute on our business plan, and have an adverse effect on our business results of operations and future prospects." Id.
70. The Offering Circular revealed that after the minimum offering amount has been met, "the company may close on investments on a "rolling basis. . ." Id. at 47.
71. The Offering Statement included audited financial statements as of December 31, 2020 and unaudited six months financial statements ended June 30, 2021. Id. at page 50. The Supplemental Offering Circular did not include any new financial statements after June 21, 2021 even though unaudited six months and one year results as of December 31, 2021 were available when the Supplement issued. This information vacuum allowed Plaintiff and other class members to be misled by Seed's materially false and misleading solicitations.
72. The January 21, 2022 Supplement addressed only two sections: "Directors Executive Officers and Significant Employees" and "Security Ownership of Management And Certain Shareholders." There was no update to any financial condition or status of NowRx as a going concern, nor was there any disclosure of the progress of the C stock offering.
73. Internally, at NowRx, the Company's financial condition and its capital raising as detailed in its December 15, 2021 Minutes of a Regular Meeting of the Board of Directors of NowRx, Inc. and information in the "Board Meeting __________ 12-15-2021" told a materially different and bleaker story of events at NowRx. See NowRx-SEC-220 0000005-19.
74. The company forecast net loss of $9,047,633 million for three quarters 2021 based on $15,568,839 million of revenue versus a net loss of 10.4 million for all of 2020.
75. The Company internally shared that "Total Equity" had gone from $3,043,316 as of June 30, 2021 to negative 41,454 as of September 30, 2020.
(NYSCEF Doc. No. 9, ¶¶ 45-75 [emphasis added]).
A May 17, 2022 email sent by Seed Invest to potential investors (including the plaintiff) [*4]provides an illustrative example:
Hi Joseph,
I'm Cary Breese - CEO and co-founder of NowRx.
First off, I want to take this opportunity to thank you for your interest and support in NowRx's Series C raise on Seedinvest - it truly means a lot. NowRx is now the largest campaign in Seedinvests history with over $23.5M raised from over 7,700 investors. None of this would not be possible without the incredible backing of both our existing and new investors!
As we approach the final four days of what could very well be our last equity crowdfunding round, I'd like to pause and reflect on some of the amazing highlights we have been able to achieve with the help of the crowd over the last five years.
• We have been able to grow revenue from just under $700K to an annual run rate of over $32M*
• Announced five new facilities this year to date, and will be able to service six states with a total of 13 active pharmacy locations
• Increased our share price by over 1,650%**
• Announced our new partnership with Hyundai Motor Group
But even beyond these stats is the impact that NowRx is continuing to make on the American pharmacy system - something we believe makes this a great investment (beyond just the financial incentive). The lack of a convenient, affordable, and reliable option for pharmacy is a very real problem for many patients - resulting in preventable hospitalizations, a $290B problem according to the New England Healthcare Institute.
However, with NowRx's tech-powered pharmacy solutions, we are able to minimize these issues and get customers the medications they need - delivered right to their doorstep.
With your investment in this round, NowRx will be able to begin our expansion plans,and bring pharmacy the way it should be to patients and doctors across the country. We are incredibly excited to end this round in four days and get to work making NowRx a nationwide brand.
We hope that you will join us by investing today!
Best,
Cary Breese, CEO
The stock market may be up and down, but it has little correlation with private investments available on SeedInvest. A decade ago, only the wealthiest 2% could reallocate funds to private companies in times of market volatility. Now you can too.
You are receiving this email because you are a registered user on SeedInvest. If you would like to stop receiving general updates from us, unsubscribe here.
If you would like to stop receiving all Seedinvest marketing emails, including deal introductions, newsletters, event invitations, and new product announcements, please unsubscribe here. Please note you will still receive investment confirmation emails and all other transactional emails related to activities on your account.
*Unaudited and subject to change
**Past performance is no guarantee of future results. The results achieved by one customer may not be representative of the experience of other customers and is no guarantee of success or future results.
NowRx is offering securities through the use of an Offering Statement that has been qualified by the Securities and Exchange Commission under Tier 11 of Regulation A. A copy of the Final Offering Circular that forms a part of the Offering Statement may be obtained from: NowRx: https://www.seedinvest.com/nowrx
Copyright (c) 2022 Circle Internet Financial Limited ("Circle"), All rights reserved. This communication is intended solely for the use of the individual(s) to whom it was intended to be addressed. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as a recommendation of, or an offer to sell or as a solicitation of an offer to buy, any financial product. Investments are offered only via definitive transaction documents and any potential investor should read such documents carefully, including all risks, before investing. Startup investments involve a high degree of risk and those investors who cannot hold an investment for the long term (at least 5-7 years) or afford to lose their entire investment should not invest in startups. All securities-related activity is conducted by SI Securities, LLC dba SeedInvest, an affiliate of Circle, and a registered broker-dealer. and member FINRA/SIPC. located at 135 Madison Avenue, 5th Floor, New York, NY 10016. To learn more about investing in startups and its risks visit www.seedinvest.com/academy.
(NYSCEF Doc. No. 30, at 10-12 [emphasis added]).
By way of a second example, later that same day, Seed Invest sent another email touting the success of the capital raise campaign and giving the impression that the opportunity and time to invest was short:
NowRx surpasses $24M in investments & there is still time to invest before the campaign closes on Friday
We are excited to announce that NowRx, a digital health platform, has surpassed $24M raised. This current Series C campaign is what we believe to be the largest equity crowdfunding campaign in U.S. history — beating its previous record as the largest raise in SeedInvest history, when its oversubscribed Series B raised $20M from over 9,500 investors.
Since its first raise on Seedinvest in 2016, NowRx has:
• Partnered wth Hyundai to explore new solutions for same-day medication delivery
• Grown its share price over 1,650% *
• Grown its revenue from just over $600K to an annual run rate of over $32M**
• Announced five new facilities this year to date, and will be able to service six states with a total of 13 active pharmacy locations
The campaign is successfully funded and closing this Friday, May 20th at 11:59pm ET — less than 4 days from today.
To account for any potential technical difficulties, SeedInvest encourages everyone (especially first time investors) to confirm investments as soon as possible. To secure a spot in the round, investors need to complete the online process and receive an email confirmation by 11:59pm ET on Friday, May 20th. Investments cannot be accepted after this time.Please note that investors are, however, given additional time to complete any required follow-ups after this deadline has passed (including funding investments).
The stock market may be up and down, but it has little correlation with private investments available on SeedInvest. A decade ago, only the wealthiest 2% could reallocate funds to private companies in times of market volatility. Now you can too.
You are receiving this email because you are a registered user on SeedInvest. If you would like to stop receiving general updates from us, unsubscribe here.
If you would like to stop receiving all Seedinvest marketing emails, including deal introductions, newsletters, event invitations, and new product announcements, please unsubscribe here. Please note you will still receive investment confirmation emails and all other transactional emails related to activities on your account.
* Past performance is no guarantee of future results. The results achieved by one customer may not be representative of the experience of other customers and is no guarantee of success or future results.
** Unaudited and subject to change
NowRx is offering securities through the use of an Offering Statement that has been qualified by the Securities and Exchange Commission under Tier 11 of Regulation A. A copy of the Final Offering Circular that forms a part of the Offering Statement may be obtained from: NowRx: https://www.seedinvest.com/nowrx
Copyright (c) 2022 Circle Internet Financial Limited ("Circle"), All rights reserved. This communication is intended solely for the use of the individual(s) to whom it was intended to be addressed. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as a recommendation of, or an offer to sell or as a solicitation of an offer to buy, any financial product. Investments are offered only via definitive transaction documents and any potential investor should read such documents carefully, including all risks, before investing. Startup investments involve a high degree of risk and those investors who cannot hold an investment for the long term (at least 5-7 years) or afford to lose their entire investment should not invest in startups. All securities-related activity is conducted by SI Securities, LLC dba SeedInvest, an affiliate of Circle, and a registered broker-dealer. and member FINRA/SIPC. located at 135 Madison Avenue, 5th Floor, New York, NY 10016. To learn more about investing in startups and its risks visit www.seedinvest.com/academy.
(Id., at 7-9 [emphasis added]).
Sometimes, according to the AC, the Email Solicitations did not have a link to the offering documents at all (see, e.g., NYSCEF Doc. No. 30 at 79).
For completeness, and as relevant, the Offering Circular stated the financial condition as of June 2021, and the May 2022 1-K indicated that NowRx had not previously been profitable as of December 2021 and included a "going concern" opinion as of April 2022 (approximately 2 months into the Proposed Class Period) which indicted as follows:
Liquidity and Capital Resources
As of December 31, 2021, the company's cash and equivalents was $5,961,641. To date, the company has not made any profits and is still a "development stage company." The company has recorded losses from the time of its inception in the total amount of [*5]$33,069,371 as December 31, 2021.
In accordance with ASU No. 2014-15 Presentation of Financial Statements —Going Concern (subtopic 205-40), our management evaluates whether there are conditions or events, considered in the aggregate, that raise substantial doubt about our ability to continue as a going concern within one year after the date that the audited financial statements are issued. We have incurred substantial losses since our inception and we expect to continue to incur operating losses in the near-term. We expect that we will need to raise additional capital to meet anticipated cash requirements over the next several years, depending on changing market and competitive conditions, our ability to secure lower cost of goods with volume, as well as our ability to gain further efficiencies from our proprietary automation technology. In addition, we regularly consider fundraising opportunities and will determine the timing, nature and amount of our financing based upon various factors, including market conditions and our operating plans. As we have done historically, we may again in the future elect to finance operations by selling equity or debt securities or borrowing money. If we raise funds by issuing equity securities, dilution to stockholders may result. Any equity securities issued may also provide for rights, preferences or privileges senior to those of holders of our common and preferred stock. If additional funding is required, we cannot assure you that additional funds will be available to us on acceptable terms on a timely basis, if at all, or that we will generate sufficient cash from operations to adequately fund our operating needs. If we are unable to raise additional capital or generate sufficient cash from operations to adequately fund our operations, we will need to curtail planned activities to reduce costs. Doing so will likely have an unfavorable effect on our ability to execute our business plan, and have an adverse effect on our business, results of operations and future prospects.
(NYSCEF Doc. No. 17 at 16). 
According to the AC, Pluto Holdings, LLC (Pluto), Ryan Michael Feit, and Circle Internet Financial Public Limited Company (Circle) "controlled" Seed Invest for Section 15 purposes:
19. Defendant Pluto Holdings LLC is a Delaware limited liability company organized in 2017 which is the managing member of Defendant SI and is named herein as a controlling person with respect to the solicitations which are the subject of this suit.
20. Defendants Ryan Michael Feit and Christopher M. Myers were CEO and CFO of SI at all relevant times and are named herein as controlling persons with respect to the solicitations that are the subject of this suit.[FN1]
21. Defendant Circle Internet Finance Public Limited Company ("Circle Internet") was and is the owner of SI and the Platform and is named herein as a controlling person of SI and Seed. Seed and SI were purchased by defendant Circle on or about March 4, 2019.
. . .
131. Defendants Feit, Myers, Pluto And Circle were culpable and controlling persons in Defendants Seed Invest Technology Limited and SI Securities LLC violations of 12(a)(2) of the Securities Act pursuant to 17 C.F.R. §230.159A.
(NYSCEF Doc. No. 9, ¶¶ 19-21, 131).
The defendants in this case argue that the case must be dismissed because (i) statements made in emails are not actionable, (ii) the Email Solicitations constitute inactionable puffery, (iii) the Offering Circular provided accurate and adequate disclosures of NowRx's financials and the risks associated with investing in NowRx, (iv) any deficiency in the Offering Circular was solved by the May 2022 1-K which provided updated financials and risk disclosures and which (v) the plaintiff can be charged with knowledge of, because the May 2022 1-K was publicly filed on the SEC's Edgar database one month before the plaintiff purchased his NowRx shares. As discussed below, the arguments fail.
Discussion
On a motion to dismiss pursuant to CPLR 3211, the court must afford the pleading a liberal construction and accept the facts as alleged in the complaint as true, according the plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit any cognizable legal theory (Leon v. Martinez, 84 NY2d 83, 87-88 [1994]; In re Sea Ltd. Sec. Litig., 227 AD3d 595, 595 [1st Dept 2024]). 
It is well settled that in order to survive a CPLR 3211 motion to dismiss, a claim brought under the 1933 Act need not satisfy the heightened pleading standing of CPLR 3016(b) and must only satisfy CPLR 3013 s notice pleading requirements (Feinberg v. Marathon Patent Group Inc., 193 AD3d 568, 570-571 [1st Dept 2021]; Rubenstein v. Credit Suisse Group AG, 457 FSupp3d 289 [2020]; In the Matter of Netshoes Sec. Litig., 64 Misc 3d 926, 933 [Sup Ct, NY County 2019]).
As this Court has previously discussed, claims brought under the 1933 Act are, at the heart, negligence-based claims where the statute imposes the duty — i.e., to act truthfully in the offering of public securities. A defendant's state of mind is not relevant because scienter is not an element under Sections 11 or 12(a)(2) (i.e., as opposed to a claim based on fraud or otherwise under the Securities and Exchange Act of 1934) (In re Uxin Limited Sec. Litig., 2020 WL
1146636, * 6 [Sup Ct, NY County 2020]; In re Netshoes Sec. Litig., 68 Misc 3d 788, 794-795 [Sup Ct, NY County 2020]).
Section 11 of the 1933 Act imposes liability based on the contents of a registration statement both for what it includes and for what it omits (Omnicare, Inc. v Laborers Dist.Council Const. Indus., 135 S Ct 1318, 1327-1330 [2015]; In re Uxin Limited Sec. Litig., 2020 WL 1146636, *7). Section 12 imposes liability on any person who offers or sells securities pursuant to a prospectus containing material misstatements or omissions of material fact (Mahar v General Electric, 65 Misc 3d 1121, 1129 [Sup Ct, NY County 2019], affd 188 AD3d 534 [1st Dept 2020] citing In re Morgan Stanley Info. Fund Sec. Litig., 592 F3d 347, 359 [2d Cir 2010]). As discussed above, the AC alleges violations of Sections 12 and 15, not Section 11.
In determining whether a misstatement or omissions is material, it must be viewed in the context of all of the defendants' representations taken together and whether it would have misled a reasonable investor (Rombach v Chang, 355 F3d 164, 172 n 7 [2d Cir 2004]). An omission is material if "in light of the information already disclosed to investors . . . there is a substantial likelihood that the disclosure of the [omitted material] would have been viewed by the reasonable investor as having significantly altered the total mix of information [already] made available" (Rubenstein, 457 FSupp3d at 295, citing In re ProShares Trust Sec. Litig., 728 F3d 96, 102 [2d Cir 2013] [citations omitted and alterations and emphasis in original]). Neither [*6]accurate statements about past performance, nor expressions of puffery and corporate optimism are actionable under the 1933 Act (In the Matter of Netshoes Sec. Litig., 64 Misc 3d at 926; Rombach, 355 F3d at 174; Nadoff v Duane Reade, Inc., 107 FedAppx 250, 252 [2d Cir 2004]). 
For the purposes of a Section 12(a)(2) claim, the relevant date for determining the materiality of a misleading disclosure or omission is the date of purchase (In re All. Pharm. Corp. Sec. Litig., 279 F Supp 2d 171, 185 [SDNY 2003] ["The securities laws do not leave plaintiffs without recourse when events that occur after the effective date of a registration statement/prospectus render statements therein misleading. Section 12(a)(2) provides plaintiffs with what Section 11 does not—a cause of action against defendants based on their failure to disclose events that occurred after [the filing of a registration statement or prospectus.] Unlike Section 11, Section 12(a)(2) does not specify the point in time to which materiality is related. However judicial interpretation makes the time of purchase the crucial moment for the determination of materiality."]). Here, the plaintiff purchased his NowRx stock on June 8, 2022. This is the relevant date for consideration.
I. The Statements in the Email Solicitations Are Actionable Under Section 12
A statutory seller for purposes of Section 12 includes someone "who solicits the purchase, motivated at least in part by a desire to serve its own interests or the securities' owners" (Pinter v. Dahl, 486 U.S.C. 622, 647 [1988]).[FN2]
Unquestionably, Seed Invest qualifies as a statutory seller.
The defendants are not correct that the boiler plate disclaimer inserted at the bottom of the Solicitation Emails (this "communication is for information purposes only and should not be regarded as a recommendation of, or an offer to sell or as a solicitation of an offer to buy, any financial product") transforms their hard sell pushes into something other than actual solicitations. They do not. The clear and unambiguous language and purpose of the Solicitation Emails urging purchase coupled with a hyperlink to a page where NowRx could be purchased (NYSCEF Doc. No. 30) sounds the death knell for this argument. In addition, and for the avoidance of doubt, Gustafson v. Alloyd Co., 513 U.S. 561, 578 (1995), does not preclude liability for solicitations sent by email. In that case, the United States Supreme Court held that Section 12(a)(2) does not apply to secondary market trading and that the term "prospectus" as used in Section 12 does not include private contracts for sale because private contracts are not held out to the public. Here, the Email Solicitations were not private, and constitute a "prospectus, notice, circular, advertisement, letter, or communication, written or by radio or television, which offers any security for sale or confirms the sale of any security" (15 USCA § 77b) for the purposes of the 1933 Act because they were widely disseminated as part of a capital raising campaign designed to sell NowRx to the public at large. To be clear, what is important is the content (i.e., not the form) of the communication, the manner in which it is delivered and the purpose for which it is delivered. Gustafson does not stand for the broad proposition that statements in emails are not actionable under Section 12(a)(2) under any circumstances and dismissal based on the fact that the solicitations were in emails is not warranted under the facts and circumstances of this case.
[*7]II. The Email Solicitations Were Not Mere Inactionable Puffery
Whether a statement constitutes puffery depends upon the context in which it is made (In re Petrobras Sec. Litig., 116 F Supp 3d 368, 381 [SDNY 2015]). As discussed above, in the Email Solicitations, time and time again, Seed Invest touted its NowRx fund raising campaign as "the largest equity crowdfunding campaign in U.S. history" and that the campaign was "successfully funded" (NYSCEF Doc. No. 30, at 7-9). The need to raise capital so that NowRx would have sufficient funds was precisely the issue identified in the going concern opinions identified in the Offering Circular and the May 2022 1-K. Thus, affording the plaintiff every favorable inference as the Court must at this stage of the proceeding, this can not be said to have been mere puffery upon which a reasonable investor would not have relied or that the statements were not materially misleading as a matter of law because these statements gave the plaintiff and other potential class members the impression that Seed Invest's capital raise satisfied NowRx's need for additional capital identified in the Offering Circular and the May 2022 1-K (ECA, Local 134 IBEW Joint Pension Tr. of Chicago v JP Morgan Chase Co., 553 F3d 187, 206 [2d Cir 2009]; In re Sea Ltd. Sec. Litig., 227 AD3d 595, 595 [1st Dept 2024]).
III. The Offering Circular and May 2022 1-K Do Not Mandate Dismissal
The defendants are also not entitled to dismissal based on the argument that the dated disclosures made in the Offering Circular and May 2022 1-K were true when made. This is not a Section 11 case and the argument that this is a "fraud by hindsight" case rings hollow. The claims are brought pursuant to Sections 12 and 15 and the Email Solicitations sent on or about the time of purchase which suggested that the concerns raised in the dated Offering Circular and May 2022 1-K were or had been addressed underscores the fatal flaw in this argument. As discussed above, among other things, the Email Solicitations contained dozens of statements indicating that NowRx's Series C offering was the "largest raise in SeedInvest history," had raised tens of millions of dollars and that, as such, NowRx was a "great investment," well positioned for the future (NYSCEF Doc. No. 30). In addition, and as discussed above, the May 2022 Form 1-K which was filed before the plaintiff received the Email Solicitations and purchased his shares did not disclose the growing expenses associated with the Seed Invest capital raise campaign including (i) Seed Invest's fee or (ii) that after December 2021 the Seed Invest campaign was netting NowRx less and less after marketing expenses. Thus, as of the June 2022 purchase of NowRx, the plaintiff alleges that Email Solicitations were materially misleading (In re All. Pharm. Corp. Sec. Litig., 279 F Supp 2d, at185). This is sufficient.
IV. The Plaintiff Has Adequately Alleged Section 15 Control Liability
Section 15 of the 1933 Act creates liability for individuals or entities that control any person liable under Section 11 or 12 of the 1933 Act, and thus relies in part on the plaintiff's ability to demonstrate liability under Section 11 or Section 12 (In re Uxin Limited Sec. Litig., 2020 WL 1146636, *10). To state a claim, the plaintiff must allege "(a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator" (In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 637 [S.D.NY 2007]). Control means "the power to direct or cause the direction of the management and policies of [the primary violators], whether through the ownership of voting securities, by contract, or otherwise" (S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1473 [2d Cir. 1996]). Ultimately, "[w]hether a person is a controlling person is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss" (Katz v. [*8]Image Innovations Holdings, Inc., 542 F. Supp. 2d 269, 276 [S.D.NY 2008]).
According to the AC, Pluto was the managing member of Seed Invest (NYSCEF Doc. No. 9, ¶ 19), Circle owned it (id., ¶ 21), and Mr. Feit was its CEO (id., ¶ 20). Each had "the power to direct or cause the direction of the management and policies of [the primary violators], whether through the ownership of voting securities, by contract or otherwise" (S.E.C. v. First Jersey Sec., Inc., F.3d 1450 [2d Cir. 1996]). This is sufficient at this stage of the litigation. Dismissal of the Section 15 claims is thus simply not warranted.
The Court has considered the parties' remaining arguments and found them unavailing.
Accordingly, it is hereby
ORDERED that the defendants' motion to dismiss is denied; and it is further
ORDERED that the defendants shall submit an answer within 20 days of this decision and order; and it is further
ORDERED that the defendants shall appear at a preliminary conference on September 27, 2024, at 12:00pm.
DATE 8/29/2024
ANDREW BORROK, J.S.C.

Footnotes

Footnote 1:Christopher M. Myers has been dismissed from the case (NYSCEF Doc. No. 10).

Footnote 2:The defendants concede Seed Invest is a statutory seller for purposes of Section 12 (NYSCEF Doc. No. 26, at 10).